Thomas D. Willis, C. H. Gloth and Isaac Wolf, Road Commissioners of Mill Creek Township, v. The Erie City Passenger Railway Company and The Erie Electric Motor Company, Appellants (1).

*Street railways—Rights on roads—Equity—Findings of fact.*

A finding of fact that a switch 360 feet long instead of 1,000 feet long, as contracted for by a street railway company, will be all that is necessary for the company's use, and is within the meaning of "necessary turnouts," in an ordinance, will not be reversed by the Supreme Court where the finding is in accordance with the weight of· the evidence, and is substantially in accordance with the uncontradicted testimony in the case.

Where road commissioners by resolution authorize a street railroad to build its road along a certain highway, provided it should be constructed south of the center of the road except at points where switches and turnouts are required, the company is entitled to lay only a single track in such highway, and it will not be permitted to construct a double track railway under the guise of building switches.

Argued April 26, 1898. Appeal, No. 345, Jan. T., 1897, by defendants, from decree of C. P. Erie Co., Sept. T., 1893, No. 3, granting injunction. Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity restraining defendants from constructing a double track.

WALLING, P. J., filed the following opinion, which is given in full, for use not only in this case, but in the next succeeding one :

The bill in the above case was filed for the purpose of restraining the defendants from extending their side tracks, etc., and also from. laying a double track along the Lake Road in Mill Creek township.

I find the facts as follows :

First. The Erie City Passenger Railway Company defendant is a corporation duly organized under the laws of this commonwealth, and chartered by Act of March 1, 1867, P. L. 302, which act provides, inter alia, as follows:

" That said company are hereby authorized and empowered

to construct a railway, to be worked by horse power, and to carry passengers over the same by single or double track from the corner of Second and Holland streets in the city of Erie westwardly to State street; thence southwardly along State street, Turnpike and Peach streets, to the Ridge Road, with branches as follows: One connecting at Eighth street, running westwardly on Eighth street to Raspberry street," etc. Then after specifying certain other branches not material to this case, is the following clause: "Also on such other streets of said city of Erie, borough of South Erie or townships of Mill Creek as may be deemed advisable by the board of managers, subject, nevertheless, to the assent of the corporate authorities as above named." Said act also further states that, "before said company shall use and occupy said streets, the consent of the corporate authorities of the city of Erie, the borough of South Erie and the township of Mill Creek shall be first obtained; and the consent shall be taken and deemed to have been given, if said authorities shall not within thirty days after the passage of this act, by ordinance duly passed, signify their disapproval thereof;" and the last section of said act is as follows:

"Section 7. The road herein authorized shall be commenced within one year, and finished and in operation, from Second and Holland streets to the Buffalo Road, within two years, and the entire road, including the branches, within three years from the passage of this act."

The Erie Electric Motor Company defendant is a corporation duly organized pursuant to the Act of March 22, 1887, P. L. 8, entitled "An act to provide for the incorporation and regulation of motor power companies for operating passenger railways by cables, electrical or other means," and that said last named company is operating the lines of the said Erie City Passenger Railway Company by means of electricity as the motive power.

Second. There is and has been for many years a common public highway leading westwardly from Erie City through Mill Creek township, known as the Lake road, which is an extension of West Eighth street in said city, and is of the width of fifty feet. About two and one half miles west of the western limits of said city, and situate on the south side of said

Lake road, is a large public cemetery, known as "Trinity Cemetery," and about 3,500 feet north of the said road, and nearly opposite to the said cemetery is the place known as the "Head," which is a popular summer resort situate at the head of Presque Isle Bay. Prior to 1889, the defendants had built and were operating a single track passenger railway on West Eighth street in said city, extending from State street to the western limits of the city.

Third. For the purpose of enabling defendants to extend their said street railway along the Lake road through Mill Creek township to Trinity cemetery, the road commissioners of the said township on the third day of June, 1889, duly passed the resolution of which the following is a copy:

" Resolved, That said Erie City Passenger Railroad Company and its lessees, the Erie Electric Motor Company, be and they are hereby granted the right to occupy and extend their railroad through and along the public highway known as the Lake road, from the western limits of the city of Erie to Trinity Cemetery: Provided, That said railroad shall be constructed south of the center of the road, except at points where cross-overs, switches and turn-outs are required; and provided, that said companies shall bear all expenses of laying said railway and shall cross streets at grade and all such crossings shall be kept in proper condition by said company; and all private crossings shall be kept in proper condition by the company without any expense to the property owners. The poles of said company are to be set as near to the south fence as practicable." Which said resolution was accepted by the said Erie City Passenger Railway Company.

Prior to the passage of said resolution, to wit: on May 11, 1889, and for the same purpose, the owners of all the land abutting upon the said Lake road between the western limits of the city and Trinity cemetery, except the owners of one or two farms, executed and delivered a paper of which the following is a copy:

" We, the undersigned, owners of property in West Mill creek, fronting on the Lake road, from the western boundary of the city limits to Trinity Cemetery, do hereby grant the Erie City Passenger Railway Company, and its lessees, the right to occupy and extend their line of railway, and the nec-

essary turn-outs, and to operate the same through and along said Lake road, in front of our respective properties, to Trinity Cemetery, and we do hereby release the said railway company from all claims for damages for the occupation of said road, or so much thereof as may be necessary for their right of way for said tracks, and from any and all other damages we may sustain by the construction of said railway, and its operation, which may be unavoidable by its construction and operation."

Pursuant to which resolution and stipulation the defendants during the year 1889 built the railway along and upon said Lake road from the western limits of the city of Erie to Trinity cemetery.

In the spring of 1890, the defendants having arranged for the right of way across the Marshall and Scott farms from the western entrance of said cemetery to the Head, and wishing to extend their railway in said Lake road along said cemetery to said western entrance, did on April 19, 1890, obtain from the road commissioners of said township a resolution as follows (omitting certain provisions not important to this case):

"Whereas, the Erie City Passenger Railway Company and the Erie Electric Motor Company, its lessee, are desirous of extending their lines along the Lake road along the cemetery;

"Therefore, be it resolved, that the Erie City Passenger Railway Company, and the Erie Electric Motor Company, its lessee, are hereby granted the right to extend their track along the south side of the road in Mill creek township, to the west entrance of Trinity Cemetery, and cross said road at grade to extend their line to the 'Head.' And that during the year 1890 the defendants did so extend their railway along said road and to the 'Head.' That the railroad so built by the defendants in 1889 and 1890 was a single track road. That no part of said railroad in Mill Creek township was built until 1889, at which time and since the Erie Passenger Railway Company has been operated by the Erie Electric Motor Company as lessee, and that said last named company has operated the said railway from Erie city to the 'Head'" ever since the year 1890, and is still operating the same.

Fourth. In the early part of 1893 the defendants began to lengthen and change the location of their switches or turn-outs

in the said Lake road in such a way as to indicate their intention of constructing in said road very extended sidings, or possibly a double track, at which time the bill in this case was filed and a preliminary injunction was granted and continued until the hearing restraining the defendants from the acts above stated. And since the filing of said bill the condition of said switches has remained in statu quo.

When the bill was filed on July 3, 1893, the defendants had and still have five switches or turn-outs in the Lake road between the city limits and Trinity cemetery. These are known as the "Sullivan switch," the "Railroad or Rolling Mill switch," the "Ball switch," the "Tracy switch" and the "Cemetery switch."

These switches are distanced apart as follows: From the Cranberry switch (which is inside the city limits) to the center of the "Sullivan switch," is 851 feet and 6 inches; from the center of the "Sullivan switch" to the center of the "Railroad switch" is 1235 feet and 3 inches; from the center of the "Railroad switch" to the "Ball switch" is 2,378 feet; from the center of the "Ball switch" to the center of the "Tracy switch" is 3,983 feet and 2 inches; from the center of the "Tracy switch" to the center of the "Cemetery switch" is 3,007 feet and 2 inches; and from the center of the "Cemetery switch" to the point where the track leaves the Lake road is 937 feet and 2 inches; and the entire length of the track in the Lake road west of the city limits is 12,392 feet and 3 inches.

The entire length of these respective switches, including the leaders, that is, from extreme point to extreme point, is, "Sullivan switch," 445 feet; "Railroad switch," 282 feet and 6 inches; "Ball switch," 292 feet and 9 inches; "Tracy switch," 253 feet; and "Cemetery switch," 252 feet and 4 inches.

The available part of these switches, that is where the tracks are three feet or more apart, so that cars can pass, is as follows: "Sullivan switch," 269 feet; "Railroad switch," 89 feet and 3 inches; "Ball switch," 99 feet and 6 inches; "Tracy switch," 54 feet and 7 inches; and "Cemetery switch," 59 feet.

The length of the West Eighth street branch inside the city is 7,230 feet, on which there are now three switches of the aggregate available length of 1,515 feet; these have been

extended largely since 1890; and the line leading from the
cemetery to the "Head" is double tracked for more than
one half of its entire length.    This entire line from State
street to the "Head" is about four and one half miles long.

The evidence shows that these switches in the Lake road
were built at different times.    The Railroad switch appears
to have been built in 1889; the Tracy switch about 1890; the
Ball switch in 1892; and the Sullivan switch in the spring of
1893.    I am unable to find from the evidence when the Ceme-
tery switch was built.    Formerly there was a switch opposite
the Starr farm, which was superseded by the Ball switch in
1892.    These switches appear to have been built from time to
time as the work progressed and as found necessary.    I am un-
able to find, as requested by plaintiff, that the defendants ever
supposed or decided that the switches as originally located were
the necessary and sufficient turn-outs for the completed road.
The evidence shows they were not so intended.

Fifth.  This railway west of the city limits is largely a sum-
mer line, and the traffic thereon from May until October is at
times very heavy.    It is usually very heavy on Sundays, and
on all days when there are picnics or other attractions in the
day or evening at the "Head."    And the "Head" being a
popular resort there are held there a large number of picnics,
dances and other gatherings every summer.    This was so be-
fore the railroad was built, and is more largely so now.

The defendants' summer cars are 33 feet long, and on busy
days they use trailers, that is, two cars attached together.

None of these switches in the Lake road is long enough to
admit of more than two cars on a side, except the Sullivan
switch, which will hold six cars on each side; on large picnic
days the defendants use about 30 cars on this line, and fre-
quently on such occasions more cars will come together at
these short switches than can pass without "sawing" back
and forth, which causes much delay and annoyance to the pas-
sengers, etc.    This might be remedied in part by shortening
the leaders of the switches and lengthening the available part
of the switch, the evidence shows that leaders should reasona-
bly be about 65 feet long, and some of these are much longer;
but even with leaders of that length, these switches are too
short to reasonably accommodate the traffic on this line.

And these switches are badly arranged as to distance apart; they should be practically of equal distance, and yet these run all the way from about 800 feet to about 4,000 feet apart. This causes delay at all times.

Sixth. There is a vast amount of travel over this Lake road from the city to Trinity cemetery in wagons, carriages, on bicycles, etc., and also a large amount of travel on foot. This is the most traveled road leading into Erie city, and the travel thereon is increasing from year to year.

Next to the fence on the north side of the road is a gravel path of an average width of from three to four feet, which is largely used by pedestrians, and also as a cycle path. To the south of this path is a row of telegraph poles, and at some places shade trees, next to which comes the ditch or gutter; south of the gutter is the driveway or roadbed proper. The driveway opposite these switches is from 22 to 24 feet in width. This driveway is not only largely used, both day and evening, by wagons, carriages, etc., but also is largely used by people on bicycles. South of the driveway is the street car track, which was built as near as practicable to the south line of the road. The cars running on this line, and especially those on the switches next to the driveway, have a tendency to frighten horses passing along the south side of the driveway, and cause them to shy off to the north, to the possible collision of wagons, etc., on that part of the driveway.

The travel on this road at times is so dense as to render it more or less unsafe, especially by reason of the liability of horses to become frightened by the operation of cars as above stated, and a double track or extended switches, making a double track for much of the way, would increase this danger. The north switch at nearly all of these switches is several feet nearer the center of the street than the main line, for which reason cars thereon are more apt to frighten horses.

Seventh. A double track street railway in this road from the city limits to Trinity cemetery would be of great advantage to defendants and of great convenience to the public using the street cars; and a double track railway practically for one half of the distance, caused by making each one of the switches from 1,000 to 1,200 feet in length would be of some advantage to defendants, as it would enable them to run their cars with less care

and make faster time and to that extent would be of some convenience to the public traveling upon the street cars.  But with
the said road, its present width, and used as it is, a double track
street railway therein in whole, or in part as above stated, would
be a serious inconvenience and detriment to the public using
said road by the other modes of travel.  But to equalize the
distance between said switches would be a decided benefit to
defendants and to the passengers upon their cars, and would not
be of any additional inconvenience or detriment to the public
otherwise using the street.  And also to make said switches
each of sufficient length to safely admit of the passage on either
side of four or five cars at one time would be a manifest advantage to defendants and their passengers.  And the collection of
cars and their delays and the sawing back and forth that would
thus be avoided would in my opinion fully compensate the public otherwise using said street for any inconvenience that might
be occasioned by this increased length of the switches.

[At the time the above bill was filed in 1893 the defendants
were proceeding to extend the said five switches to the length
of at least 1,000 feet each.  In my opinion no such length
of switches was or is necessary for defendants' use upon said
line as a single track railway or was in contemplation of any
of the parties at the time leave was given to the defendants
to construct their railway in said public road, and I believe from
all the evidence, and so find that five switches each of the length,
including the leaders (that is from point to point from the place
where the tracks first diverge), of 360 feet would be all that is
necessary for defendants use upon said road between the city
limits and Trinity cemetery and would be as much switching
facilities as was within the meaning of the parties as " necessary
turn-outs," when leave was granted defendants to occupy this
street.] [1] And I do find that the switches now upon the lake
road are insufficient in length, and not at proper distances from
each other to accommodate the traffic upon the said line.

[Eighth.  Between the time that leave was granted defendants to occupy this road in 1889 and the filing of this bill in
1893 the defendants expended a very large sum of money, probably exceeding $100,000, upon the faith of their right to occupy
this street.  They built the track first to Trinity cemetery and
then to the " Head."  They put up poles and feed wires, bought

many extra cars and also extended their plant for generating
motive power, etc.  But I do not find that they did any of
these things upon the faith of their right to anything more in
the Lake road than a single track railway and necessary turn-
outs.] [2]

Ninth.  At a special meeting of the road commissioners of
Mill Creek township, held May 6, 1897, at which all the commis-
sioners were present, a resolution was unanimously adopted as
follows:

" Resolved, That any permission at any time heretofore
granted to the Erie City Passenger Railway Company and the
Erie Electric Motor Company or either of them to use any por-
tion of the Lake road west of the city of Erie for the purpose
of extending their track or the track of either of them or of
maintaining or operating the same, be and the same is hereby
revoked so far as the said licensees have not acted thereon up-
to this date ; and any permission so far as it may be claimed by
said companies or either of them to be a license to them or either
of them to lay any additional track or rails or to put in new sid-
ings, turn-outs or switches, or to lengthen or extend any sidings,
turn-outs, or switches already constructed by them is hereby
revoked."

On May 19, 1897, two papers were served upon both of the
defendant companies, one of which is as follows, and the other
in substance the same :

" To the Erie City Passenger Railway Company, and Erie
     Electric Motor Company :

" You will take notice that we, the undersigned owners of
land on the Lake road west of the city of Erie, hereby with-
draw any permission heretofore granted to you to occupy the
said Lake road in front of our respective properties for the
purpose of a street railway, so far as the construction of any
new sidings, turn-outs, switches, track or tracks, or the length-
ening or extension of any sidings, turn-outs, switches, track or
tracks, already laid or constructed by you are concerned.

" Our intention in withdrawing said permission or license
being to restrict you to the use of so much of the road as you
now use, and to prevent the occupation and use of any further
or other portion of the said road by you from this date.

" Erie, Pa., May 10, 1897."

These papers were signed by every property owner who signed the original consent given said defendants, or his successors in title, excepting the successors to the title of land signed for by F. F. Marshall, Esq.

From which facts the following legal conclusions are found:

First. The said Lake road being a country road, the construction of a street railway therein constitutes an additional servitude thereon, and defendants had no right to construct their railway therein without the consent of the road commissioners of Mill Creek township, and also the consent of the owners of land abutting upon that portion of the said road traversed by said railway.

[Second. By virtue of consent given to the defendants by the said road commissioners and land owners, and by the fact that defendants have constructed their railway in said road, the defendants have the right to maintain and operate in the said Lake road, between the western limits of the city of Erie and the point where said railway leaves the road opposite Trinity cemetery, a single track street passenger railway, with such switches or turn-outs as are necessary for the proper operation of a single track street railway; but defendants have no right to construct a double track railway in said street.] [3]

Third. The consent given defendants by the road commissioners and land owners being without consideration, was at first a mere license, and could have been revoked; but prior to the filing of the bill in this case the defendants had acted upon said license and had constructed their railway over the entire road provided for in said licenses, and therefore the said licenses had become and are irrevocable.

Fourth. The right to construct a single track railway carries with it as an incident the right to build necessary switches and turn-outs, which right to build turn-outs, etc., was also expressly stipulated for in this case; and after the main line of railway was built the right of defendants to build necessary turn-outs could not be affected, and are not affected by the acts of the road commissioners and land owners in attempting to withdraw their consent as to unconstructed switches, etc.

[Fifth. The location of switches by defendants prior to 1893, under the facts of this case, did not exhaust their power to build necessary turn-outs or to relocate the same permanently

so as to equalize the distance, etc., and while ordinarily the length of switches, etc., might be a matter in the discretion of the railway company, yet where, as in this case, the defendants, under the guise of building switches, are. manifestly attempting to double track their railway, or at least a large portion of it, it then becomes, in my opinion, the duty of the court to find from the evidence what number of switches, and of what length, are necessary turn-outs to which defendants are entitled.] [4]

Sixth. The authority of defendants in this public road, that is, the extent to which they may occupy it with track, sidings, etc., is to be governed by their legal rights to the use of this street, under the facts, and not by what might be of mere convenience or advantage to them.

Seventh. The license granted to defendants was not only to construct a railway in the Lake road, but also " necessary turnouts," and such power is not exhausted until both the railway and necessary turn-outs are built.

In support of the first legal conclusion are the following recent cases and others : P. R. R. Co. v. Montgomery Co. Pass. Ry. Co., 167 Pa. 62 ; Heilman v. Lebanon, etc., Ry. Co., 175 Pa. 188 ; Heilman v. Lebanon, etc., Ry. Co., 180 Pa. 627 ; Philadelphia & Trenton R. R. Co. v. Passenger Ry. Co., 6 Dist. Rep. 269.

[As to the second conclusion that defendants are not entitled to a double track in the Lake road, I construe the license to give them only a single track railway. It permits them to extend the West Eighth street branch, which was and is a single track railway. The license provides for " turn-outs," which would not be necessary in a double track road, and defendants so construed the license by building a single track railway ; and I am also of the opinion, though perhaps not necessary to the decision of this case, that the right to build double track railway, granted in the charter to the Erie City Passenger Railway Company, only extends to the main line and not to the branches.] [5]

As to the third conclusion, it seems to be well settled in Pennsylvania that when the licensees have acted upon the license and expended money upon the faith thereof, it becomes irrevocable. One of the leading cases on this question is Rerick v. Kern, 14 S. & R. 267.

This has been followed in many cases. See also Davis v. Souder, 10 Phila. 113; Huff v. McCauley, 53 Pa. 206; Pierce v. Cleland, 133 Pa. 189.

On the fourth and fifth conclusions attention is called to Norristown v. Penna. R. Co., 3 Montgomery Co. Law Reports, 5; Stroudsburg Borough v. Stroudsburg Pass. R. R. Co., 12 Pa. C. C. R. 124; Pottsville v. People's Ry. Co., 148 Pa. 175; Cleveland & Pittsburg Ry. Co. v. Speer, 56 Pa. 325.

The fact that this railway was not built within three years from the time the charter was granted to the Erie Passenger Railway Company, and also the fact that the authorities of Mill Creek township did not disapprove of this railway by ordinance within thirty days after the granting of said charter, do not, in my opinion, change the legal rights of the parties in this case. I do not see very well how the township authorities could disapprove of a street railway more than twenty years before it seems to have been thought of. Several of defendants' witnesses give their opinions that these switches should each be 1,000 feet or more in length, but several of the same witnesses say there should be a double track the entire length of the road. And as to both matters, I regard this evidence as referring to convenience and not reasonable necessity. The evidence shows that 32 cars was the largest number ever had on this whole line in one day, and also that these cars can be run safely on a siding to within 25 or 30 feet of each other, so placed that the two sides of a switch 1,000 feet in length will hold at one time the entire 32 cars; to say that five such switches are necessary on about one half of this line is not sustained by the facts. Of course long sidings on which cars might be run as on a double track would enable defendants to make better time and to use less cars, but are not necessary to a single track road. The switches which I have suggested, 360 feet long, would provide for leaders at each end 65 feet long, and 230 feet of parallel track on which four, and when trailers are used, five cars, can safely pass on each side, are ample in my opinion to meet the necessities of the defendants. I do not pass upon the question suggested by defendants, which I regard as a remote possibility, that future change in machinery may make longer sidings necessary. It is urged on behalf of plaintiffs that the switches constructed on this line

prior to 1892 were all that defendants regarded as necessary, and were intended as permanent, and that such switches exhausted defendants' right in the matter. If these were found to have been intended as the permanent switches for the line, there would be great force in this contention. But when it is considered that said switches were built at different times, that they are of insufficient length, and that there is great inequality of the distance between them, I do not think the court would be justified in finding that they were intended as the permanent switches for this line.

In my opinion something should be done to relieve the congested condition of the travel upon this part of the Lake road. Either a new road should be opened from the city to Trinity cemetery, or the Lake road should be widened. And the attention of the road commissioners and property owners, as well as that of the street car company, is called to this matter in the hope that some action may be taken in the matter above suggested. Until such action is taken all parties using this street will have to submit to more or less inconvenience.

### DECREE.

[And now, August 2, 1897, this cause having been heretofore fully heard and argued by counsel, and thereupon, upon due consideration thereof, it is ordered, adjudged and decreed that the injunction heretofore granted be, and is hereby, modified so as to permit the defendants to relocate their five switches on their line in the Lake road, between the western limits of the city of Erie and the western entrance to Trinity cemetery, so as to approximately equalize the distance between them, etc.; but that the entire length of no one of said switches, including the leaders, that is, the whole length from the point where the tracks diverge, shall exceed 360 feet, and that as soon as any of said switches are relocated and constructed the present switches, so far as thus supplied, shall be removed from the street by defendants. This order is not intended to interfere with the present length of the Sullivan switch, unless the locating of same be changed. And it is further ordered that the defendants pay the costs of this suit. And as thus modified the injunction is made permanent.] [6]

*Errors assigned* were (1–5) portions of opinion as above, quoting them; (6) the decree, quoting it.

*J. M. Sherwin* and *S. A. Davenport*, with him *T. A. Lamb*, for appellant.—The evidence in the case showed that defendants, in order to accommodate the traveling public, needed at least five switches, 1,000 feet in length. The plaintiff offered no evidence to rebut this. There was no evidence in the case that the defendants at the time of the issuing of the injunction in the above stated case contemplated the construction of a double track or anything more than five switches, 1,000 feet in length. This defendants contended they had a right to do under the evidence in the case : Wyoming Borough v. Wilkes-Barre, etc., Ry., 6 Del. Co. Rep. 278; Schofield v. Penn. Schuylkill Val. R. R., 8 Mont. 125 ; Booth on Street Railways, p. 70, note ; Ransom v. Citizens' Ry., 104 Mo. 375; People's Pass. Ry. v. Philadelphia, 14 Phila. 231 ; Phila., Wil. & Balt. R. R. v. Williams, 54 Pa. 103; Black v. Philadelphia & Reading R. R., 58 Pa. 249; People's Pass. Ry. v. Baldwin, 37 Leg. Int. 424; Electric Ry. v. City of Grand Rapids, 47 N. W. Rep. 567; Hestonville, Mantua, etc., R. R. v. Philadelphia, 89 Pa. 210.

*G. A. Allen* and *Frank Gunnison*, with them *John S. Rilling* and *L. Rosenzweig*, for appellee.—While it is conceded that when a railway company has constructed its road within the period limited by law, it may subsequently from time to time construct such switches or sidings as may be necessary for the handling of its business and the operation of its road, yet when a railway company has failed to construct its road within the period limited by law, and where its right to construct said road is obtained by license from another authority, and not under its charter, then it cannot claim such rights under its charter, the same having been forfeited by them: Pottsville v. People's Ry. Co., 148 Pa. 175.

OPINION BY MR. CHIEF JUSTICE STERRETT, Oct. 17, 1898:

This case was tried by the learned president of the court below with such painstaking care and ability that little if anything can be profitably added to the opinion embodying his findings of fact, conclusions of law, etc. A careful considera-

tion of the record has satisfied us that there is no error in the decree or in proceedings leading up thereto of which the defendants have any just reason to complain.

The first specification alleges error in the following extract from the seventh finding of fact:

"At the time the above bill was filed, in 1893, the defendants were proceeding to extend the said five switches to the length of at least 1,000 feet each. In my opinion no such length of switches was or is necessary for defendant's use upon said line as a single track railway, or was in contemplation of any of the parties at the time leave was given to the defendants to construct their railway in said public road; and I believe from all the evidence, and so find, that five switches each of the length, including the leaders (that is from point to point from the place where the tracks first diverge), of 360 feet would be all that is necessary for defendant's use upon said road between the city limits and Trinity cemetery, and would be as much switching facilities as was within the meaning of the parties as 'necessary turn-outs,' when leave was granted defendants to occupy this street."

This excerpt is about one third of the seventh finding; and while it would be fairer to the court below to consider, as a whole, the entire finding, we have no doubt that the part complained of, as thus severed from the context, is entirely free from error. The court's finding as to the necessary number and length of the switches is a fair and legitimate inference from the testimony of the defendants' witnesses. It is true that these witnesses gave it as their opinion that five switches of 1,000 feet each in length would be necessary, but they also gave the data,—length and number of cars required and that could be placed upon a switch of. given length, etc.—upon which they based their opinions; and, according to these facts and figures, five switches of 360 feet in length each will contain more cars than have ever been used at any one time since the construction and operation of the road. The facts and figures given by defendants' witnesses did not warrant the conclusion that switches of more than 360 feet in length were necessary. The learned judge's conclusion was drawn from all the evidence, and not merely from the erroneously expressed opinions of the defendants' witnesses. His finding as to the num-

ber and length of the switches is not only in accordance with the weight of the evidence on the subject, but it may be said that it is substantially in accordance with the uncontradicted testimony in the case.

The eighth finding of fact recited in the second specification was fully warranted. Its correctness is unassailable by anything that appears in the record.

The third to fifth specifications, inclusive, are to the conclusions of law therein recited respectively. We have no doubt as to the correctness of each of these conclusions. There is nothing in any of them that requires discussion.

The sixth and last specification is to the decree itself.

It follows from what has already been said that this specification cannot be sustained. There appears to be nothing in the case that calls for further comment. If any of the parties in interest have been aggrieved by the action of the court below, it is certainly neither of these appellants.

Decree affirmed and appeal dismissed at appellants' costs.